19-4095

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS

REGINALD DARNELL RICHARDSON                    Plaintiff

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

AUG 19 2019

DOUGLAS F. YOUNG, Clerk
By
        Deputy Clerk

vs.                          CASE #

TRI-STATE IRON AND METAL Co.,
AN Arkansas Corporation                    Defendant

## I. Introduction

1.    This is a civil rights complaint brought by the plaintiff, Reginald Richardson, a state prisoner seeking back pay, compensatory and punitive damages pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000e. Et. seq; 42 U.S.C § 1981 Et. seq; and the Arkansas Civil Rights Act pursuant to A.C.A § 16-123-101 Et. seq, on the grounds that the defendant subjected the plaintiff to a racially hostile work environment on the basis of his race; and once he attempted to grieve said discrimination the defendant retaliated in the form of unlawful discharge.

## II. Jurisdiction

Page 1 of 30

2. This Court Jurisdiction is invoked pursuant to 28 U.S.C § 1331; 28 U.S.C § 1343 et. seq; and supplemental jurisdiction pursuant to 28 U.S.C § 1367.

## III. Parties

3. The plaintiff, Reginald Richardson, is confined within the Arkansas Department of Correction at the Wrightsville Unit, but during the events described in this complaint he was housed at the Texarkana Work Release Unit and employed by the defendant.

4. The defendant, Tri-State Iron and Metal Company, Inc., is a private corporation that consist of a scrap metal processing that is located at 1725 East 9th Street in Texarkana, Arkansas 71854. The defendant has approximately one hundred and twenty eight (128) employees in which ten (10) are employed through the Work Release Program.

## IV. Factual Statement

5. The plaintiff, an African American,

was hired by the defendant after being interviewed by Gary Griffen, a white supervisor employed by the defendant. And shortly thereafter on or about November 11, 2017, the plaintiff begun working as a manual laborer.

6. As a manual laborer, the plaintiff job duties included performing preventive maintenance servicing of assigned equipment; performing manual labor cleanup duties; opening boxes and containers of steel, aluminum, copper, etc.; sorting and placing said metals into their assigned bins for processing; and folk lift operator, etc.

7. During the plaintiff employment the supervisor, Gary Griffen, made obscene and racially derogatory comments directed towards the plaintiff on several occasion; had stated on multiple occassions his dislike of the plaintiff to the plaintiff co-workers; and had refused to recommend or allow the plaintiff to work weekend's.

8. The plaintiff list the following instances of unwelcome harassment as follows:

## A. Racially Hostile Work Enviroment

9. On or about December 13, 2017, the plaintiff was working at an area called the paper warehouse, along with a co-worker named Terry Hampton.

10. While the co-worker was on the otherside of the warehouse operating a folk lift, the plaintiff sweeping the floor when the supervisor, Griffen, walked into the warehouse.

11. Upon entering Griffen notice the plaintiff sweeping and assumed the other folk lift that plaintiff operated was in his path. Griffen then approached the plaintiff, and instructed plaintiff to move the folk lift out the way.

12. The plaintiff responded saying: "Its not in my way, but since you instructed me to move it I will."

13. The supervisor, Griffen, in response stated: "why ever time you kind... (At which time he paused then continued) hey

from here on out when I ask you to do something dont responded just do it. If you do responded address me by saying yes sir, that is if you like working here?"

## B. Racially Hostile Work Environment

14. On or about February 2, 2018, which was a Friday, and the National football league (NFL) had a championship game scheduled to be played that Sunday. The two (2) teams scheduled to play were the New England Patriots v. the Philadelphia Eagles.

15. The supervisor, Griffen, is a proclaim Dallas Cowboy fan, but his second favorite team is the Patriots.

16. As the plaintiff was leaving from work after clocking out he begun to walk pass the supervisor, Griffen, at which time the plaintiff stated to Griffen: " go Eagles."

17. Once the supervisor, Griffen realize that the plaintiff was cheering for the opposite team he turned and faced

the plaintiff and plaintiff seen from his facial expression that Griffen was upset.

18. At which time, in the presence of the entire night shift, the supervisor Griffen, looked at me and stated: "you motherfucker." In a loud and belligerent manner.

### C. Racially Hostile Work Enviroment

19. After the Feb. 2 incident (claim B), several of the night shift employees approached the plaintiff, and stated the supervisor, Griffen, had made numerous derogatory statements indicating his dislike towards the plaintiff.

20. Because of the supervisor's comments of dislike about the plaintiff to his co-workers, some of his co-workers were reluctant to work along with the plaintiff on work assignment.

21. One employee, Elbert Crawford, at one point and time was the plaintiff best friend until the supervisor, Griffen, voiced his disapproval of the plaintiff.

22. Crawford, no longer wanted to socialize with the plaintiff while they were at work, and at one point the plaintiff and Crawford got into a heated argument in front of the supervisor, Griffen, all because Crawford did not want to work with the plaintiff while the supervisor, Griffen, was present.

23. The supervisor, Griffen, negative comments about the plaintiff to his co-workers, the co-workers reluctant to want to work with the plaintiff and to socialize with the plaintiff in the supervisor presence, all transpired up until the plaintiff's unlawful discharge.

24. These employees consist of: William Davis, Elbert Crawford, Casey Lambert, Chayse Byrd, John Doe #1 and John Doe #2.

D. Racially Hostile Work Environment

25. On or about March 9, 2018, the plaintiff, along with the rest of the night shift workers, were all performing their preventive maintenance duties (PM's).

26. At which time the plaintiff completed the assigned area and begun to head to the next area that needed cleaning leaving his co-workers behind.

27. As the plaintiff walked to the next area he began to sing a heavy metal song, and as he arrived he notice the supervisor, Griffen, standing in the corner in the dark.

28. The plaintiff then spoke to Griffen saying: "hey Gary whats up?"

29. The supervisor, Griffen, responded saying: "what were you doing just now singing? If so you sound like a fucking idiot!" In a rude and demeaning fashion.

## E. Racially Hostile Work Enviroment

30. On or about April 18, 2018, the plaintiff and co-worker, Casey Lambert, were working in the shipping department sanding and painting three (3) large square metal containers.

31. While working that evening it became extremely hot and the plaintiff begun to sweat, and the sweat begun to run from underneath his shirt and his hard hat.

32. The sweat from the plaintiff hard hat went into his eyes making it difficult to see and impossible to continue working. Plaintiff then removed his hard hat, sat it on the table and begun to wipe the sweat from his eyes.

33. Once the plaintiff regained his vision he walked about twenty (20) feet from his work area to a wooded area in order to urinate, leaving his hard hat on the table.

34. After the plaintiff had finish he then proceeded back to his work area and began working, but plaintiff had forgotten to put his hard hat on.

35. Approximately five (5) minutes had passed when the supervisor, Griffen, approached, and notice that the plaintiff

was working without wearing a hard hat.

36.   The supervisor, Griffen, then became furious! Griffen then looked directly at the plaintiff and stated: "Motherfucker! I must've told your black ass a hundred times about wearing your P.P.E's (personal protective equipment) at all times while you are on the yard! Your kind dont ever fucking listen!"

37.   He continued stating: "I've told your monkey ass that the [safety inspection people] can pop up at anytime, and if they see you without your P.P.E's on then they will fine us! Do you understand what the fuck I'm saying? We are not going to be fined because of your dumb ass..."

38.   At that point the plaintiff blacked out, and instead of reacting in the fashion he was thinking plaintiff simple disconnected his ears, and tuned the supervisor out while he continued to say more and more obscenities and racial comments at the plaintiff.

39. The supervisor, Griffen, obscene and racial tirade continued for several minutes, while the plaintiff just stood there feeling humiliated, degraded and intimidated by his supervisor comments once again.

40. Said tirade did not cease until the plaintiff and his co-worker directed the supervisor, Griffen, attention to how well they had painted the containers.

41. After witnessing that entire ordeal the plaintiff co-worker, Casey Lambert, no longer referred to the supervisor, Griffen, as the plaintiff's supervisor, but instead Lambert begun calling the supervisor, Griffen, the plaintiff's "Pee Paw."

F. Racially Hostile Work Environment

42. When the plaintiff was hired he was informed that during the spring and summer months he would be called in to work on Saturday's.

43. Plaintiff was told that the work release employee's were the ones who

would be called in, and the ones who had been there the longest would go first.

44.   The plaintiff was eagered to work on Saturday's; for one it was time and half pay; for too you got a chance to get away from the unit for one more day and enjoy a beautiful summer day; and three the supervisor, Griffen, was off that day so the plaintiff could relax knowing he would not be subjected to any insults or ridicule, to his face or behind his back.

45.   Once the time arrived for the plaintiff to be called in to work he was never called.

46.   Instead the plaintiff was skipped over, and instead of picking him, the supervisor, Griffen, choose work release employees' that had not been there working for the defendant as long as the plaintiff had.

47.   The plaintiff mentioned this to the plant manager, Rick McCloskey, at

which time the plant manager assured the plaintiff that he would instruct the supervisor, Griffen, to call him in to work that following weekend.

48.    When that weekend arrived the plaintiff was not called, and nor at any other time while the plaintiff was employeed by the defendant was he ever called in to work on Saturday's.

49.    The supervisor, Gary Griffen, subjected the plaintiff to a racially hostile workplace creating a work environment that was filled with insults; racial epithets; unjust denials of work assignments; and intimidation the entire time the plaintiff was employeed by the defendant.

50.    As soon as the plaintiff, along with two (2) co-workers, gathered the courage and attempted to grieve their separate issues pertaining to their supervisor, Gary Griffen, conduct they were immediately terminated.

## Unlawful Discharge In Retaliation

51. On or about June 9 thru 10, 2018, the plaintiff, along with two (2) co-workers, Chayse Byrd and Elbert Crawford, both African American, spent the weekend discussing how once they returned to work that Monday they were going to locate the plant manager, Rick McCloskey.

52. They had decided that they were going to inform the plant manager about all the obscene and racially derogatory statements and actions their supervisor, Gary Griffen, had committed against them; and to request to be moved to the day shift.

53. That conversation between the plaintiff, the two (2) co-workers and the plant manager, Rick McCloskey, never took place.

54. On June 11, 2018, the plaintiff arrived at work at approximately 2:11 pm, clocked in and was immediately approached by the supervisor, Gary Griffen, and informed that plaintiff was needed in the main warehouse opening boxes.

55. The plaintiff responded by saying: "okay", and then he looked at the supervisors' face and saw his disapproval of the plaintiff response.

56. The plaintiff then said: "yes sir," and immediately left to go find the plant manager, but said manager was not at work that day.

57. At approximately 2:30 pm., the official time we start recieving pay, the plaintiff reported to the main warehouse and begun opening boxes.

58. While the plaintiff was still working, at approximately 2:55 pm. he observed and heard Elbert Crawford talking to the asst. plant manager, Chris Moerlhe.

59. At which time the plaintiff heard Crawford telling Chris about how disrespectful the supervisor, Gary Griffen, had been towards him and how we were hoping to speak to the plant manager, Rich, about Griffen's conduct.

60. Once their conversation was complete Crawford came and assisted the plaintiff opening boxes. Crawford then informed the plaintiff that Chayse Byrd had refused to work and was still in the breakroom, and the supervisor, Griffen, was looking for Byrd.

61. Although the plaintiff had overheard the conversation between Chris and Crawford, the plaintiff asked what they had been discussing anyways.

62. At which time Crawford told the plaintiff that since the plant manager, Rick, was not at work he decided to inform Chris of how the supervisor, Griffen, has been treating us, and to reiterate that we wanted to be moved to the day shift.

63. When Crawford said that the plaintiff immediately looked into the breakroom, and observed the asst. plant manager, Chris Moerke, talking to the supervisor, Gary Griffen.

64. The asst. plant manager and the supervisor had instructed the other employees to exit the breakroom, as they remained in there alone, talking for several minutes.

65. Once their conversation was complete, the supervisor, Griffen, exited the breakroom looking upset, and in a stern voice he instructed Crawford to stop assisting the plaintiff and go and sort cans.

66. The plaintiff continued separating the metal and other material from the boxes, and placing it in their assigned bins for processing.

67. The plaintiff did not finish his job assignment until approximately 3:41 pm., at which time he proceeded to exit the main warehouse and went directly to his assigned work area called the over-size line.

68. At exactly 4:00 pm. the over-size line started up and material

begun to flow down the line, the plaintiff then performed his job duties and retrieved the material off of the line, and placed it in their assigned bins.

69.    Approximately thirty (30) minutes had passed, and around 4:30 pm. the entire machine was shut down.

70.    A co-worker named Brodie, instructed the plaintiff, along with the entire night shift to report to the break room in order to have a meeting.

71.    Upon entering the break room the plaintiff notice that Elbert Crawford and Chayse Byrd were not present.

72.    Once the meeting was underway the supervisor, Griffen, informed all of us that Byrd and Crawford had been fired. He said the two (2) were sent back because they had refused to work, after he had instructed them to do so.

73.    During the meeting Griffen also went over issues pertaining to

Productivity, and showed us how the defendant has specific forms that are filled out on each department, to keep up with production.

74. The meeting lasted for about fifthteen minuttes (15) and once it was over the plaintiff reported back to his assigned work area.

75. Once the machine started back running the plaintiff resumed performing his job duties on the over-size line.

76. The plaintiff worked the over-size line the entire shift, from once it started back running at approximately 4:45 pm., until it shut down at 11:30 pm.

77. At approximately 11:58 pm. the plaintiff, along with the entire night shift, clocked out and proceeded to exit.

78. The work release van met the plaintiff, along with five (5) other work release employees, at the front of the

Plant at approximately 12:21 AM.

79.    At which time the plaintiff, along with the five (5) work release employees, loaded into the van and proceeded to the unit.

80.    Upon arriving at the unit and signing the in and out log, the plaintiff, along with the five (5) work release employees, notice that Byrd and Crawford were nolonger wearing their work uniform (gray shirt and dark blue pants).

81.    Byrd and Crawford had turned their work uniforms in and were dressed in their state issued clothing (all white shirt and pants), which meant they were nolonger employeed by the defendant.

82.    The plaintiff, removed his work uniform in which he worked in inorder to wash it, he then proceeded to perform his hygene and once that was complete, he went and laid down on his rack inorder

to be well rested to perform his job duties for the defendant later that day.

83.    On June 12, 2018, at approximately 9:17 am. that same morning, the plaintiff was awaked by correctional officer, Garth, and instructed by said officer to gather all of his property because he was being transferred.

84.    The plaintiff then asked said officer: "what was going on, why am I being sent back to the unit?"

85.    At which time officer Garth did not respond. So plaintiff begun to pack and continued to enquire into the reason for his termination from the work release program, and being sent back to prison.

86.    As the plaintiff was still packing a lieutenant, Dexter L. Homes, approached and asked the plaintiff what had happened with the plaintiff and his supervisor the day before while he was at work.

87.    The plaintiff was unable to respond because he had no idea of what the lieutenant was talking about.

88.    At which time a William Davis, one of the plaintiff's co-workers, informed the lieutenant that whatever the defendant said the plaintiff had done, he did not do.

89.    The lieutenant then turned and looked at the co-worker after hearing the sincerity in his voice, and saw it in his face. He then turned and faced the plaintiff and saw a confuse and puzzled look on the plaintiff face.

90.    As lieutenant Holmes stood there appearing to weigh the truthfulness of the plaintiff and his co-worker's statements and conduct.

91.    Correctional Officer, Garth, reappeared and escorted the plaintiff to the clothing room where plaintiff turned in his work uniform, and placed on state issued clothing and then escorted

the plaintiff to isolation.

92. The plaintiff remained in isolation for three (3) days before being transferred back to prison.

93. Once the plaintiff arrived, shortly thereafter he was presented a major disciplinary, and in the body of said disciplinary it stated: "On June 11, 2018, approximately 3:27 pm [the plaintiff] was terminated from employment with Tri-State Iron and Metal for insubordination and failure to comply with supervisors instructions on the job..."

94. Then and only then was the plaintiff afforded the opportunity to be made fully aware of the defendant's articulated reason(s) for his discharge.

95. As well as informing the plaintiff as to what caused his removal from the Texarkana Work Release Program, resulting in the plaintiff being returned to prison and later disciplined based solely upon the defendant allegations within

said disciplinary.

96.    The plaintiff asserts that the reason(s) the defendant has alleged that resulted into the plaintiff termination, are all false.

97.    The plaintiff has never been defiant, disobedient, or failed to comply with any of his supervisor(s) instruction, on or prior to June 11, 2018.

98.    The plaintiff conducted himself professionally and courteously at all times while working for the defendant, especially on said discharge date.

99.    The plaintiff performed his job duties well and diligently during the entire time he was employeed by the defendant.

### V. Claims of Relief

### A. Hostile Work Enviroment

100.    The actions of the white

supervisor, Gary Griffen, subjected the plaintiff, an African-American, to a hostile workplace creating a work enviroment filled with insults; humiliation; unjust denials of work assignments; mental and emotional suffering; racial epithets; and intimidation throughout his tenure with the defendant in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

## B. Retaliation

101.    The defendant retaliated against the plaintiff by firing him less then one (1) hour after discovering that the plaintiff, along with two (2) co workers, were attempting to grieve the supervisor, Gary Griffen, conduct in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

## VI. Exhaustion of Available Remedies

102.    The plaintiff sent a letter to the defendant soon after his termination informing them that he had been a victim

of discrimination during and after his employment. Once the defendant failed to respond the plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission, and later received a right to sue notice with respect to all claims. (See Exhibit A)

## VII. Requested Relief

WHEREFORE, the plaintiff requests that this Honorable Court grant the following Relief:

A. Issue an injunction ordering the defendant to:

1. Provide training to all managers, supervisors and laborers with a focus on discrimination within the workplace.

2. Provide the plaintiff and the Director of the Arkansas Department of Correction, Wendy Kelley, with a letter (1) acknowledging the accusation in the plaintiff's major disciplinary that is described in this complaint are false, (2)

request in said letter that said director expunge the disciplinary conviction pertaining to said disciplinary from the plaintiff's institutional record, and (3) request that the director reinstate the plaintiff into the work release program at the North West Work Release Unit.

B. Award the plaintiff back pay in the following amount:

1. $27,718.62 (twenty seven thousand, seven hundred and eighteen dollars and sixty two cents) from 6/12/19 to 8/2/19 against the defendant.

C. Award the plaintiff compensatory damages in the following amount:

1. $100,000 (one hundred thousand dollars) against the defendant for the racial epithets; unjust denial of work assignments; insults; humiliation; intimidation; and emotional and mental injuries sustained as a result of the defendant subjecting the plaintiff to a hostile work environment; and retaliating against the plaintiff by firing

him less then an hour after discovering the plaintiff was attempting to grieve said conduct.

D. Award the plaintiff punitive damages in the following amount:

1. $100,000 (one hundred thousand dollars) against the defendant for engaging in discriminatory practices with malice and reckless indifference to the plaintiff's federally protected rights to be free from a racially hostile workplace; and to be free from retaliation for attempting to grieve said conduct in the form of firing the plaintiff

E. Plaintiff seeks a jury trial.

F. Grant Plaintiff any and all additional relief this Honorable Court may deem Just, Proper and Equitable under the circumstances.

Respectfully Submitted,

Reginald D. Richardson

## VIII. Verification

I, Reginald Richardson, the plaintiff herein, and in support of my civil rights complaint after first being duly sworn, do hereby swear under penalty of perjury, that the statements, matters and things contained in this complaint herein are a true and accurate account to the best of my knowledge, information and belief, and for purpose therein stated, set forth and contained

_____
Plaintiff

STATE OF ARKANSAS)
                 ) ss
COUNTY OF PULASKI )

Subscribed and Sworn to before me, A Notary Public, on this 5 day of August, 2019.

_____
Jerry McDonald
NOTARY PUBLIC

My commission expires: 2-9-2028
Page 29 of 30

TERRY MCDONALD
NOTARY PUBLIC-STATE OF ARKANSAS
JEFFERSON COUNTY
My Commission Expires 02-09-2028
Commission # 12704014

## IX. Certificate of Service

The undersigned hereby certifies that the original and two (2) copies of this civil rights complaint was mailed, postage pre-paid, this 7 day of August 2019, to: Douglas F. Young, Clerk, Isaac C. Parker Federal Building, 30 South 6th Street, Room 1038, Fort Smith, Arkansas 72901-2437.

Reginald Darnell Richardson
Wrightsville Unit A.D.C. # 154985
Post Office Box 1000
Wrightsville, Arkansas 72183